UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| EMILY COOK,                                ) | |
|       Plaintiff,               ) | |
|                                        ) | |
|    vs.                                   ) | 1:06-cv-1536- RLY-TAB |
|                                        ) | |
| FARMERS INSURANCE EXCHANGE,   ) | |
| TRUCK INSURANCE EXCHANGE, FIRE ) | |
| INSURANCE EXCHANGE, MID-CENTURY ) | |
| INSURANCE COMPANY, FARMERS NEW ) | |
| WORLD LIFE INSURANCE COMPANY,  ) | |
| ILLINOIS FARMERS INSURANCE        ) | |
| COMPANY, and FARMERS GROUP, INC., ) | |
|       Defendants.            ) | |

**REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.**     **Introduction.**

Plaintiff Emily Cook filed a claim against Defendants pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101–12213, and under Indiana's Employment Discrimination against Disabled Persons Act ("IEDDPA"), Ind. Code 22-9-5. [Docket No. 45 at 1.] Plaintiff alleges Defendants failed to provide her with a reasonable accommodation regarding her service dog, which aids her with the symptoms of her bilobal partial complex seizure disorder. Defendants move for summary judgment arguing that: (1) Plaintiff does not have standing to pursue her claim because she is an independent contractor rather than an employee; (2) Plaintiff cannot prove the qualified elements of her claim under the ADA; and (3) Plaintiff failed to exhaust her administrative remedies under the IEDDPA. [Docket No. 85 at 1, 2, 23.] Plaintiff does not challenge Defendants' motion for summary judgment with respect to her claim under

the IEDDPA. [Docket No. 97 at 24.] Because the record establishes that Plaintiff was an independent contractor rather than Defendants' employee, the Magistrate Judge recommends the Court dismiss Plaintiff's ADA claim for lack of standing.

## II.   Background.[1]

As a preliminary matter, Defendants argue that many of the facts raised by Plaintiff in her deposition testimony should be stricken because they are "self-serving" and "mischaracterize the undisputed evidence in this matter." [Docket No. 103 at 3.] Disregarding Plaintiff's testimonial evidence on this basis is improper, and the Court declines to do so. Therefore, portions of Plaintiff's testimony are included in the background set forth below, and all facts and reasonable inferences are construed in favor of Plaintiff. *See Mote v. AETNA Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007).

In June 2003, Plaintiff was diagnosed with bilobal partial complex seizure disorder, a type of epilepsy causing secondary generalized seizures and temporary left-side paralysis. Medication only partially controls Plaintiff's condition. Thus, Plaintiff utilizes the services of her dog, Beau, to assist her when she has seizures. [Docket No. 86, Ex. 1 at 10.] Beau can warn Plaintiff of a seizure by detecting the smell of the chemical changes that occur to Plaintiff prior to having a seizure. Beau can also help prevent Plaintiff from falling and assist her to a secure location after she experiences a seizure. Plaintiff adopted Beau in September of 2004 and began using him in public in August 2005.

---

[1] Plaintiff has requested oral argument on Defendants' motion for summary judgment. [Docket No. 99.] However, Plaintiff provides no reason why an oral argument would be necessary or helpful in this matter, and the Magistrate Judge cannot ascertain a reason based on the record.

On June 10, 2005, Plaintiff and Defendants entered into a three-page Reserve Agent Appointment Agreement. [Docket No. 86, Ex. 3.] Defendants' purpose in having the Reserve Agent program was "to allow Reserve Agents the opportunity to explore selling insurance for Defendants while keeping their full-time jobs before applying to Defendants' Career Agent Program." [Docket No. 86, Ex. 7 at ¶ 5.] Under the agreement, Defendants were obligated to pay Plaintiff commission for her work, provide Plaintiff with "manuals, forms and policyholder records" in order to carry out the job, and provide Plaintiff with education and sales training programs. [Docket No. 86, Ex. 3 at ¶ A.] Plaintiff was obligated to sell insurance for Defendants, provide service to policyholders, allow Defendants to examine her records for compliance, and provide a fidelity bond in favor of Defendants. [*Id*. at ¶ B.] The agreement also states:

> Nothing contained herein is intended or shall be construed to create the relationship of employer and employee; rather, the Reserve Agent is an independent contractor for all purposes. As an independent contractor, the Reserve Agent has the sole right to determine the time, place and manner in which the objectives of this Agreement are carried out, provided only the Reserve Agent conforms to normal good business practice, and to all State and Federal laws governing the conduct of the Companies and their Agents.

[*Id*. at ¶ F.] The contract expressly states that the "Reserve Agent Training Program does not in any way guarantee appointment to the Career Agent Program." [*Id*. at ¶ G.] Reserve agents did not receive performance reviews; were not required to follow performance standards; were not reimbursed for attending seminars or training courses; were responsible for all licensing fees; were responsible for any and all costs of operation if not working from the district office; did not receive any benefits, paid holidays, sick days, or vacation days; were paid commission based on the polices they sold; and were issued a 1099 form for tax reporting purposes. [Docket No. 86,

Ex. 7 at ¶¶ 8-9, 11-14, 20, 24.]

     Prior to selling policies, Plaintiff was required to attend training classes with District Manager Christopher Ananias at the district office. [Docket No. 98, Ex. A at 139-40.] Ananias scheduled the classes around Plaintiff's part-time job at Pilgrim Manor Nursing Home. [*Id.* at 141.] Ananias told Plaintiff she was not to miss class for any unacceptable reason. Plaintiff attended five or six classes, but missed at least one class. As part of the classes, Plaintiff learned about numerous insurance products and was required to make a marketing plan, including a detailed schedule of when Plaintiff would undertake certain tasks. Ananias would amend and rewrite this schedule based on how much time he thought should be spent on a particular task and the time of day a particular task should be done. Ananias also gave Plaintiff detailed instructions about where she should go to meet potential clients. Plaintiff believed that the schedule was required, but no one supervised Plaintiff to ensure that she followed the schedule. Ananias provided Plaintiff with nearly all of her leads, and use of the district office, including all office supplies and use of secretaries, and he told Plaintiff how to dress. Furthermore, Ananias required Plaintiff to be in the office on other occasions to make phone calls, complete online training, and to watch Plaintiff run quotes to ensure that she was using the computer system properly. Plaintiff went to the district office on up to thirteen occasions during her time with Defendants.[2] Plaintiff sometimes ran quotes at home, in which case Ananias did not supervise Plaintiff. [*Id.* at 213.] Ananias asked Plaintiff to quit her job at Pilgrim Manor Nursing Home so she could be in the district office full-time, but Plaintiff did not do so. [*Id.* at 216-17.] Ananias

---

      [2] Plaintiff attended five or six classes, had two or three meetings with Ananias, and was in the district office three or four other times. [Docket No. 98, Ex. A at 144.]

insisted that Plaintiff complete the online training in the office, but she nonetheless did it at home.  [*Id*. at 211-12.]

After a few training classes, Ananias gave Plaintiff clearance to sell policies.  Ananias would tell Plaintiff what to say in her sales pitch, but she was able to make calls and present her sales pitch outside of the presence of Ananias, and even from home.  [*Id*. at 215.]  She also had discretion to decide what products to offer prospective clients.  [Docket No. 86, Ex. 7 at ¶ 15.]

On August 4, 2005, a short time after receiving clearance to sell, Plaintiff brought in a newspaper article about her and Beau, which detailed the nature of Plaintiff's condition and explained Plaintiff's use of Beau.  Plaintiff told Ananias that Beau's arrival was an "imminent thing," to which Ananias replied, "That dog is a good marketing tool," and "I'm going to get him a Farmers T-shirt."  [Docket No. 98 at 151-53.]  On August 11, 2005, Plaintiff took Beau into the office for her training class.  She arrived early in order to work on some sales-related tasks.  Shortly thereafter, Ananias approached her and said, "You need to hide Beau.  There are important people coming into the office."  [Docket No. 98, Ex. A at 155.]  Plaintiff "gave him this dumbfounded look" and asked where she was supposed to hide him.  [*Id*. at 155-56.]  When he did not answer her, she grabbed her stuff and left, and did not attend the training class that day.

In response to the August 11 events, Plaintiff contacted Defendants' Corporate Customer Relations Department complaining that Ananias would not permit her to bring her service dog to the district office.  David Pucci, Defendants' Division Marketing Manager, called both Plaintiff and Ananias to address the complaint.  Ananias then called Plaintiff on August 19, 2005, and they had a one-hour telephone conversation about Plaintiff bringing Beau into the office.  During

5

this conversation Ananias said that Beau could not come to the office without permission first, and that if a client complained about Beau or if any staff people were afraid of or had allergies to dogs, Beau would not be allowed in the office anymore.  Plaintiff again spoke with Pucci who told her that he, Ananias, and Plaintiff should sit down to discuss the issue.  In a follow-up letter from Ananias to Plaintiff dated September 8, 2005, Ananias stated in part:

> During our conversation, I stated that I have no problem with you bringing your service dog with you if this is a medical requirement.  All I asked was that you give me prior notice, so that I can notify the other independent contractors that work from my office, and give them an opportunity to prepare.  It was unknown as to any of their allergies or even fear of dogs, both concerns I have to manage.  You asked what happens when you go full-time, and establish your business from my office.  I told you we would have to cross that bridge when we got to it.
>
> As an independent contractor, it is a unique opportunity to work from the District office, not a requirement or a given right.  As the District Manager, it is my responsibility to look out for the concerns of all the agents that choose to work and train from my office.
>
> I would like to make clear; I have no problem with you bringing your service dog with you to class.  To date, I am still not clear as to whether or not you need your service dog on a daily basis, or if there are only certain circumstances where the aid is necessary.  Regardless, I will make every effort to continue to work with you.  If you need a service dog due to medical requirements, if there any documentation [sic] I should have for your agent file, please bring it to our next scheduled training class.

[Docket No. 86, Ex. 7, Attach. A.]

After she received this letter, Plaintiff called both Ananias and Pucci several times to discuss what type of accommodations would be feasible and to provide Ananias notice as to when Plaintiff and Beau would be in the office.  Neither Ananias nor Pucci returned Plaintiff's calls.

Plaintiff did not attempt to sell for Defendants again until January 2006, at which point she decided, "you know what, I'm going to work because I still have a contract, I have the right

to work, I have a contract." [Docket No. 98, Ex. A at 165.]  Furthermore, she reasoned that she would be unable, based on the terms of the contract, to work for anyone else (in the insurance business) as long as the contract was in place.  [*Id.* at 192.][3]  At that time she called Ananias and left him a message saying she would be in the next day to get a life insurance disk, which was necessary to run quotes.  When she went to the office the next day, Ananias was not there and she was unable to get the disk.  A few days later, she wrote her first policy and again called Ananias for the disk.  At that point she was able to speak to him; he told her she did a good job and that he would get her the disk, but they did not discuss Beau.  She was unable to get the disk from Ananias.  In February of 2006, she again spoke with Pucci, at which time she refused to meet with Ananias.  [Docket No. 85 at 7.]  Pucci told Plaintiff that she could no longer work, and that she could cancel her contract or wait for it to expire on July 28, 2006.  [Docket No. 98, Ex. A at 191-93.]  Plaintiff filed her complaint on October 19, 2006.  [Docket No. 1.]

**IV.    Discussion.**

In support of their motion for summary judgment, Defendants argue that Plaintiff does not have standing to sue under the ADA and that even if she does, she cannot prove the elements of her claim under the ADA.  Because the Magistrate Judge agrees that Plaintiff does not have standing to sue, the arguments on the merits need not be addressed.

The ADA protects employees but not independent contractors from discrimination based on disability; thus independent contractors do not have standing to sue under the ADA. *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 642 (7th Cir. 2004).  Defendants

---

[3] The contract provides that"[a]ll business acceptable to the Companies and written by the Reserve Agent will be placed with the Companies."  [Docket No. 86, Ex. 3 at ¶ (B)(1).]

argue that Plaintiff is an independent contractor, and Plaintiff argues that there is a genuine issue of material fact as to whether she is an independent contractor or an employee.

"The ultimate question of whether an individual is an employee or an independent contractor is a 'legal conclusion' which involves 'an application of the law to the facts.'" *EEOC v. North Knox Sch. Corp.*, 154 F.3d 744, 747 (7th Cir. 1998) (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 379 (7th Cir. 1991)). The label "independent contractor" in a contract is not binding for the purposes of Title VII. *Wilson v. United Farm Bureau Mut. Ins. Co.,* No. IP 93-1460-C H/G, 1995 WL 378521 at *6 (S.D. Ind. June 15, 1995). Rather, the "economic realities test," which involves the application of the general principles of agency, is used to determine whether a worker is an employee or an independent contractor. *Knight*, 950 F.2d at 378. The following factors are to be considered in making this determination:

> (1) The extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir. 2001) (quoting *Knight*, 742 F. Supp. at 521). The most important factor is the employer's right to control the worker's actions. *Id*. All facts and reasonable inferences are construed in favor of Plaintiff in determining Defendants' motion for summary judgement. *Mote v. AETNA Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007).

Many of the undisputed facts support Defendants' argument that Plaintiff was an independent contractor. First, the terms of the contract between Plaintiff and Defendants expressly state that Plaintiff was an independent contractor. While simply titling Plaintiff an independent contractor does not make her one, Plaintiff seems to have understood the nature of

the relationship established by her agreement with Defendants.  For example, Plaintiff understood that even though she had not shown up to the district office and had little or no contact with Ananias or any other representative of Defendants between September and January, Plaintiff was still entitled under the contract to sell policies for Defendants.  Such a right would be quite uncharacteristic of an employer-employee relationship.  Furthermore, "[c]ontracts of a set length often indicate independent contractor status," *Worth*, 276 F.3d at 264, and Plaintiff also understood the contract was for one year.

Additionally, while Ananias "required" Plaintiff to be in the office at times, Plaintiff's disregard of this mandate was of no consequence.  For example, Ananias "required" Plaintiff to be in the office to complete online training, but she completed it from home with no apparent penalty.  Similarly, while Plaintiff was "required" to attend classes, she missed at least one class, again without any indication that she was penalized.  Plaintiff admittedly worked from home a great deal of the time—she was in the district office at most thirteen times from June 10 to August 11, 2005—and no one supervised Plaintiff when she worked from home.  The undisputed evidence reveals that Ananias informed Plaintiff that she was not required to work in the district office.

Moreover, Plaintiff was not paid for the online training or any of the classes provided by Defendants, and she was responsible for all licensing fees.  This demonstrates that she bore the primary responsibility for ensuring her own viability under the contract.  She was given no benefits, sick days, or vacation days, and her pay was based entirely on commission from which taxes were not withheld.  All of these factors undermine Plaintiff's claimed status as an employee.  Additionally, in his September 8, 2005, letter to Plaintiff, Ananias reminded Plaintiff

of her independent contractor status and that her presence at the district office was neither a right nor was Plaintiff required to be there.

Nevertheless, Plaintiff's argument that she was an employee of Defendants is not without some support. Plaintiff was required to take a comprehensive training course in order to work as a reserve agent, and Plaintiff was required to be in the district office for supervision at certain times to make calls, use the computer system, and run quotes. She was required to create and maintain a schedule, which was developed by her and Ananias, who instructed Plaintiff on making calls. Ananias also told Plaintiff how to dress and where to meet people. Defendants provided for Plaintiff—but did not make her accept—office space, supplies, personnel support, and nearly all of her leads. These facts suggest that Defendants maintained some degree of control over Plaintiff.

Nevertheless, on the whole, upon accepting all undisputed facts and all facts most favorable to Plaintiff, a reasonable jury would conclude that Plaintiff was an independent contractor. Plaintiff's most important argument is that Defendants maintained control over her, mostly related to Plaintiff's training and her time in the district office. However, the limited control Ananias asserted over Plaintiff during her training is more akin to that of an instructor over a student than an employer over an employee. This is supported by the fact that Plaintiff was not paid to participate in the training. Plaintiff testified that she was able to work from home, and she completed tasks from home even when she was told to do otherwise. A job as an employee for Defendants may have awaited Plaintiff at the conclusion of her one-year contract with Defendants, and adhering to Ananias's directions likely would have improved Plaintiff's chances of achieving this milestone. But Plaintiff's relationship with Defendants ended well

before this transition materialized.  With no oversight or performance reviews, Plaintiff was ultimately left free to conduct her business in the manner of her choosing.  As a result, the record demonstrates that Plaintiff was an independent contractor not an employee, and therefore she has no standing to sue under the ADA.

The only other claim Plaintiff has alleged in her complaint is a violation of the IEDDPA, and Plaintiff does not challenge Defendants' motion for summary judgment on this claim. [Docket No. 97 at 24.]

**V.     Conclusion.**

For the foregoing reasons, the Magistrate Judge recommends that Plaintiff's motion for oral argument [Docket No. 99] be denied, Defendants' motion for summary judgment [Docket No. 85] be granted, and that final judgment be entered in favor of Defendants and against Plaintiff.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1), and failure to file timely objections within the ten days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated:   09/24/2008

_____
Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Copies to:

Bryce H. Bennett Jr.
RILEY BENNETT & EGLOFF LLP
bbennett@rbelaw.com

Adam Lenkowsky
ROBERTS & BISHOP
alenkowsky@roberts-bishop.com

Shannon Bogard Mize
RILEY BENNETT & EGLOFF LLP
smize@rbelaw.com